FRANCIS H. SHEPARD, JR., AND MARGARET R. SHEPARD, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3194–69. Filed February 9, 1972.

*David Beck*, for the petitioners.
*John James O'Toole*, for the respondent.

ATKINS, *Judge:* The respondent determined deficiencies in income tax for the taxable years 1965, 1966, and 1967 in the respective amounts of $20,532.32, $17,012.64, and $44,736.44. The only issue for decision is whether amounts received by Francis H. Shepard, Jr., during the above taxable years from the National Cash Register Co. represented royalty payments made by such company pursuant to a nonexclusive license under patents owned by Shepard or a nonexclusive license to use certain technology and, hence, ordinary income to him, or whether

such amounts represented proceeds from the sale by Shepard of such technology to such company so as to entitle him to treat such amounts as long-term capital gain.

Some of the facts have been stipulated and are incorporated herein by this reference.

Francis H. Shepard, Jr., and Margaret R. Shepard, husband and wife, filed joint Federal income tax returns for the taxable years 1965 through 1967 with the district director of internal revenue, Newark, N.J. At the time they filed their petition herein they resided in Summit, N.J. Inasmuch as Margaret R. Shepard is a party herein only because of having filed joint returns for the years in issue, Francis H. Shepard, Jr., will hereinafter be referred to as the petitioner.

The petitioner is a professional engineer. After his graduation from college he was employed as an engineer by Sperry Development Co. and, subsequently, by Radio Corp. of America. Since 1939 he has served as a consulting engineer for clients which have included Du-Pont, Bristol Instruments, Glenn L. Martin, United Shoe, and various agencies of the U.S. Government. During the course of his work for various clients petitioner developed a number of patentable inventions. The ownership of the patents which issued with respect to such inventions rested with the particular clients for whom the inventions were developed. Petitioner also developed patentable inventions while working on his own behalf and, accordingly, owned the patents which issued with respect thereto. Prior to the year 1955 he had never sold or offered to sell any of the patents which he owned.

By the middle of 1954 the petitioner had completed the development of a high-speed, alpha-numeric line printer for use in conjunction with computers. The purpose and function of such printer, known as the Model 190 High Speed Typer and hereinafter referred to as the typer, was to convert the electrical impulses produced by a computer into hard copy. The petitioner's typer accomplished such conversion with an output potential of up to 190 columns of print at a rate in excess of 20 lines per second. At that time its output potential far exceeded the output which could be obtained by the closest available art, namely, some 80 columns of print at a rate of about 1½ lines per second.

Incorporated into the petitioner's typer was a cylindrical drum which was rotated by a synchronous motor. Around the periphery of the drum were columns of raised type, each such column containing a complete alphabet, numbers, and punctuation marks. Beneath the drum were hammers, the function of which was to strike the type on

the rotating drum so as to produce the desired character on inked paper which was positioned between the drum and the hammers. Inasmuch as the drum was rotated at speeds of about 1,800 revolutions per minute (that is, about 30 revolutions per second), the peripheral speed or speed at which the type passed the hammers was very high. Thus, the hammers had to be timed exactly to enable them to strike the desired character and get away in a very short time in order to produce a clear impression of the character without blurring or smearing.

During the course of developing his typer the petitioner filed two applications for patents, each dated January 22, 1953. One such application, No. 332,712, related to an intermittent motion device which, as stated in such application, is a device "for obtaining a dwell or a series of dwells in the motion of an output shaft from a continuously rotating input shaft." The other application, No. 332,711, related to a hammer-impelling means in high-speed printers or, as stated in such application, "more particularly to a hammer assembly for high-speed printers." Two of the objects of such hammer assembly were, as stated in such application, "to provide a hammer assembly for high-speed printers for cooperation with a continuously relating type drum" and "to provide a hammer assembly for a high-speed printer in which the time of dwell of a hammer can be accurately controlled to within narrow limits."

As heretofore indicated the development of petitioner's typer was not completed until the middle of 1954. It was not until that time that the technology incorporated in the final design of the typer had been fully developed, namely, the technology involved in controlling the hammers and type drum, in advancing the paper without tearing, and in inking the originals and copies. Knowledge of the mere information contained in the above-described patent applications would not have been sufficient to enable one to manufacture petitioner's typer.

The National Cash Register Co., hereinafter referred to as NCR, wished to acquire a typer similar to petitioner's for use in connection with its Model 304 Electronic Data Processer. In July 1955, NCR purchased two typers from petitioner.[1] Shortly before the two typers were purchased Carl Beust, then the head of NCR's patent department, received an interdepartment correspondence of NCR which stated in part as follows:

Our negotiations with Dr. Shepard of the Shepard Laboratories, Summit, New Jersey, in the matter of the procurement of two of his Model 190 Typers for use

---

[1] Prior to such time the petitioner's company, then a sole proprietorship known as Shepard Laboratories, had built and sold seven typers. Four had been sold to Radio Corp. of America, and one each had been sold to Computer Research Corp., Stamford Research Center, and the U.S. Government. The first of such sales was made around 1950 and none of the above typers which were sold incorporated all of the technology which was included in petitioner's final design.

with the forthcoming Model 304 Electronic Data Processor, has reached the stage where purchase orders are being written for these units. We expect to place the orders early next week. * * *

It seems to us that to satisfy the high speed printing requirements for the 304 Data Processor and probably also for later improved Processors, it will be necessary to employ printers of the so-called "Synchronous" type similar in principle to the Model 190 Typer made by Shepard. Since the urgency associated with the development of the 304 precludes the development of a Synchronous Printer here, we intend to use the Model 190 Typer in the 304 system production.

The purpose of this letter is to acquaint you with the engineering planning in this matter so that you in turn can formulate your plans as to how you will proceed to clear our future course, in the matter of synchronous printers, with possible controlling interested parties in this field. It may be necessary, due to Shepard's inability to deliver sufficient machines, once we are in production, or due to excessively high costs in Shepard's production, to tool and manufacture these printers in Dayton. In fact, it seems to me that we should at least be ready with a design based on a conversion of Shepard's drawings to our standards and process specifications, at an early date, so as to insure a supply of printers from our factory, should for some reason or another Shepard purchased printers become unavailable.

One of the typers purchased by NCR was to be used by its Electronics Division in conjunction with the engineering prototype of its data processor. The other typer purchased was, as stated in an interdepartmental correspondence of NCR, for use—

in the Electronic Production Engineering Department at Dayton on which exhaustive tests (not simply acceptance tests) can be performed with a view to improving the printer to be supplied hereafter by Shepard, and also as an educational unit to be studied by our design engineers for the later development of our own synchronous type printer. We also intend to use it at Dayton as a guide in preparing factory working drawings of the Shepard printer so that this particular printer can be manufactured at Dayton should Shepard fail to adequately produce or should the Shepard Laboratories be purchased by some third party. In this regard, Mr. Beust has been requested to clear our course for the manufacture of the Shepard printer and/or a printer of the synchronous type of our own design.

Such correspondence also contained the following reasons why NCR felt it desirous to acquire the petitioner's typer rather than to design their own:

1. Design and design studies at NCR showed that conventional approaches employing start-stop mechanisms would not yield an alphanumeric printer of high enough speed (in lines per second) to compete with printers already offered with Electronic Data Processing Systems. Additionally, because of the large numbers of parts in the start-stop approach, it seemed likely that production costs per unit would be higher than the synchronous approach. Print quality would be good, however, as compared to the synchronous printer. Tooling costs would also likely be higher for the start-stop printer.

2. It was then thought that we should set about to design a synchronous printer. However, a study showed that if we did, we would probably finish with a design very similar to the Shepard Printer or Typer. Besides, the time sched-

ule imposed, to provide printer production to meet the schedule of the 304, made it practically impossible to accomplish a synchronous printer design, build a model, correct design errors, life test and list for production and to tool the unit.

3. The Shepard Printer was available, already designed, and due to multiple re-designs, was largely de-bugged. Contact with Shepard by our engineers yielded favorable comment about the unit technically. We then asked Shepard to visit us and in meetings with him worked out mutually acceptable specifications. In addition to buying two of his printers for prototype use, it will be necessary to work out some arrangement to acquire manufacturing rights so as to protect our future supply.

On or around August 2, 1955, Beust met with petitioner at petitioner's laboratories in Summit, N.J. During the course of such meeting Buest proposed that NCR take a license under patents issued or pending with respect to the typer so that NCR could manufacture it. Petitioner advised Beust that although there were patent applications pending which were generally relevant to the typer, such patent applications were not specific and would not enable NCR to manufacture the typer. Petitioner therefore refused to show Beust the above-described patent applications and proposed instead to sell to NCR the technology necessary to manufacture the typer.

During the course of the subsequent months the petitioner and Beust continued their negotiations. By letter dated August 12, 1955, and addressed to Buest, the petitioner stated, in part as follows:

In accordance with our conversations, we shall be happy to grant the National Cash Register Co., on the following terms, a non-exclusive license to manufacture and use the mechanical parts of our "TYPER" developments at a royalty rate of 5%:

*       *       *       *       *       *       *

On receipt of a letter from you, indicating you will take such a license if you decide to manufacture "TYPERS" in accordance with our teachings, we will send you without charge a complete set of prints of our manufacturing drawings on our latest "TYPER", and will be happy to allow your engineers to inspect our manufacturing methods.

In a letter of response to the above, which was dated September 8, 1955, and was addressed to petitioner, Beust expressed NCR's concern as to what base the 5-percent royalty rate suggested by petitioner should apply in view of NCR's intention to integrate the typer into its data processor with integrating equipment of its own development and design.

In a letter of reply, dated October 6, 1955, and addressed to Beust, petitioner stated in part as follows:

I realize that in licensing agreements it is difficult, if not impossible, to define the base to which royalties should apply. We do not expect that the complete price of a large unit of which our "TYPER" or teachings are a small part should be subject to royalty payments, neither do we want the payment of royalties to work hardships on the successful use of our teachings.

You have had experience in such matters and are much better qualified to draft the terms of an equitable and unambiguous agreement than I. I think that you do understand my desires in this connection and what I tried to cover in my letter of August 12, 1955. I would greatly appreciate it if you could phrase a practical agreement, acceptable to the National Cash Register Co. I am sure that this would be acceptable to me.

In December 1955, NCR mailed petitioner a copy of a proposed agreement. In an accompanying letter dated December 12, 1955, and addressed to petitioner, Beust stated in part as follows:

I have finally gotten around to drawing up a form of license agreement based on the conditions outlined in your letter of August 12 and as discussed during my visit to your office.

I think that you will find that this license agreement covers all the points which we discussed and which you embodied in your letter, and I would appreciate your looking over it & filling in the numbers, dates, and titles of the patent applications which have been filed by you covering various phases of the "TYPER" at the point indicated by the pencilled "X". * * *

On December 19, 1955, the petitioner signed the above-enclosed agreement and, thereafter, returned it to NCR where it was in turn signed by the president of such company on December 23, 1955. The agreement provided in part as follows:

LICENSE AGREEMENT

WHEREAS the said "Shepard" has developed certain new and useful improvements in high-speed printers known as a "Typer", which are now being manufactured and sold by the said "Shepard", and

WHEREAS certain applications for Letters Patent of the United States have been filed by the said "Shepard" relating to said inventions and improvements, as follows:

Application #332,711—High Speed Printer

Application #332,712—Intermittent Motion Device

WHEREAS "National" is desirous of acquiring the right and license to manufacture, use, and/or sell "Typers" in accordance with the designs of the said "Shepard" and the disclosures in any and all applications for Letters Patent now on file or to be filed hereafter relating thereto and any and all Letters Patent granted thereon in the United States or countries foreign thereto, for the full term of such grants and any extensions or renewal thereof, and any and all inventions and improvements in "Typers" which may be made from time to time in the future by the said "Shepard":

Now, THEREFORE, be it known that in part consideration of the sum of Ten Thousand Dollars ($10,000.00) paid to him this day by The National Cash Register Company, receipt whereof is hereby acknowledged as an advance against royalties which may become due as hereinafter provided, said "Shepard", doing business under the name of "Shepard Laboratories", as aforesaid, does hereby grant to the said "National", its successors and assigns, a non-exclusive license under said applications for Letters Patent and Letters Patent of the United States and countries foreign thereto and relating to "Typers" as now manufactured by him, and any inventions and improvements made or acquired hereafter by him and relating to "Typers"; and

In further consideration for the rights and licenses hereby granted, "National" agrees to pay to the said "Shepard" a royalty of Five Per Cent. (5%) based on the selling price of each "Typer" manufactured and sold by it in accordance with the license granted hereby, it being understood that should "National" choose to enclose a "Typer" so manufactured by it in a single enclosing casing with other units, the royalty herein agreed to shall be based only on the "Typer" unit. * * *

\*   \*   \*   \*   \*   \*   \*

"Shepard" agrees that within thirty days (30 days) from the date of this License Agreement he will furnish "National" with a complete, accurate, and up-to-date set of drawings of said "Typer", including all of its parts and components, and will from time to time, as "National" may require in order to manufacture such "Typers", furnish such information and guidance as "National" or any of its authorized representatives may request.

A signed copy of the above agreement was forwarded to petitioner by Beust and, in an accompanying letter dated December 23, 1955, Beust stated in part as follows:

In accordance with our correspondence and telephone conversation, I am enclosing herewith for your files a signed copy of the license agreement of December 19, relating to your patent applications Serial Nos. 332,711 and 332,712, under which agreement this Company will have the right, if it desires, to manufacture "Typers" in accordance with your designs under the conditions outlined in the license agreement.

\*   \*   \*   \*   \*   \*   \*

We would appreciate your sending on the set of drawings provided for on the third page of the license agreement as soon as you can do so, as we wish to study the entire situation from the standpoint of what it would mean should we decide ultimately to make the printers of this type.

Thereafter, petitioner sent to NCR some 350 drawings, designs, and blueprints which embodied the technical information necessary to manufacture the typers. Such drawings, designs, and blueprints were received by NCR on or about January 24, 1956. The patent applications referred to in the above-described agreement were never sent to NCR by petitioner nor did NCR ever request that such applications be delivered to it.

The above-described agreement between petitioner and NCR was prepared by NCR. The petitioner was not represented by legal counsel during the course of his negotiations with Beust nor was the above-described agreement explained to him by counsel.

On December 18, 1956, a patent issued with respect to petitioner's application, No. 332,712, relating to an intermittent motion device. On April 2, 1957, a patent issued with respect to petitioner's application, No. 332,711, relating to a hammer assembly for high-speed printers. Licenses with respect to such patents were granted by petitioner to Radio Corp. of America, Standard Electric Lorenz of Germany, and British Tabulating Machine Co. of England. By means of

cross-agreement Radio Corp. of America permitted the use of its license to English Electric Corp.

Subsequent to the above-described agreement between petitioner and NCR the petitioner manufactured and sold typers to, among others, Radio Corp. of America, Sylvania, General Electric, Bank of America, the Atomic Energy Commission, Rice Institute, Brookhaven, and the University of Chicago.

Around the beginning of 1958 NCR had reached the point where it was ready to begin manufacturing petitioner's typer as a part of its data processor. At this time, John J. Callahan, a patent attorney who had been employed by NCR in November 1957, reviewed the agreement between petitioner and NCR to determine what might be payable to petitioner under its terms. In order to clarify NCR's obligations under such agreement, Callahan initiated negotiations with petitioner which resulted in a supplemental agreement between petitioner and NCR dated February 25, 1959.[2] The supplemental agreement provided in part as follows:

AGREEMENT SUPPLEMENTAL TO LICENSE AGREEMENT OF
DECEMBER 19, 1955

\*      \*      \*      \*      \*      \*      \*

WHEREAS, said "Shepard" and said "National" are desirous of defining and modifying their respective rights under the License Agreement entered into the nineteenth day of December 1955, between said "Shepard" and said "National", and hereinafter referred to as "License Agreement":

NOW, THEREFORE, it is agreed by said "Shepard" and said "National" that this Agreement, hereinafter referred to as "Supplemental Agreement", be a part of said "License Agreement".

\*      \*      \*      \*      \*      \*      \*

It is further agreed by said "Shepard" and said "National" that:

\*      \*      \*      \*      \*      \*      \*

4. The following royalty is substituted for the royalty rate of Five Per Cent. (5%) set forth in said "License Agreement" and is payable by "National" to "Shepard" on "Typers" manufactured and sold by "National" in accordance with the license granted by said "License Agreement" and modified by this "Supplemental Agreement":

First one hundred (100) "Typers", Thirteen Hundred and Seventy-Five Dollars ($1,375.00) for each "Typer".

Next twenty-five (25) "Typers", One Thousand Dollars ($1,000.00) for each "Typer".

Subsequent "Typers", Five Hundred Dollars ($500.00) for each "Typer".

5. The license granted under said "License Agreement" and modified by this "Supplemental Agreement" shall in all events become a fully-paid irrevocable license, with no further royalties payable, after April 2, 1974.

---

[2] Carl Beust, the former head of NCR's patent department who had negotiated the initial agreement between NCR and petitioner, died a number of years before the hearing in this case. The record does not disclose the date of his death nor does it disclose that he was in any way involved in the negotiations between Callahan and petitioner with respect to the supplemental agreement.

6. The license granted by said "License Agreement" and modified by this "Supplemental Agreement" may be terminated by "National" at any time after November 10, 1968. This privilege of termination shall be exercised by giving "Shepard" written notice of "National's" election to terminate at least sixty (60) days in advance. In the event that "National" exercises this optional termination privilege, it is expressly understood and agreed that any royalties paid by "National" up to the date of such termination shall constitute full payment for all property, such as information and designs, which "National" may have acquired under said "License Agreement" and this "Supplemental Agreement" and which does not form an invention defined by a subsisting claim of a "Shepard" patent, and "National" shall be free to use such property as it desires without further payment to "Shepard". After such exercise of this optional termination privilege and until April 3, 1974, "National" shall be in the same position as any other unlicensed party with respect to any "Shepard" patent under which "National" had a license prior to the date of such termination.

On April 1, 1965, the petitioner and NCR entered into another supplemental agreement. Such agreement provided in part as follows:

SECOND SUPPLEMENTAL AGREEMENT

\* \* \* \* · \* \* \*

WHEREAS SHEPARD and NATIONAL have heretofore entered into a License Agreement dated December 19, 1955, and a Supplemental Agreement dated February 5, 1959, with respect to Typers ("Typers" being defined in said License Agreement) ; and

WHEREAS NATIONAL is considering the sale to original equipment manufacturers (hereinafter referred to as "OEM") of less than complete Typers (said less than complete Typers hereinafter being referred to as "OEM Typers") ; and

WHEREAS it is desirable for NATIONAL, from the standpoint of lower costs in the manufacture of Typers and parts thereof, to produce them in larger quantities than heretofore ; and

WHEREAS both parties are desirous of benefiting from said lower costs through increased numbers of sales ; and

WHEREAS it is desirable from NATIONAL'S standpoint in paying royalties to SHEPARD on its OEM business in such OEM Typers to redefine the royalty specified in said License Agreement, but only with respect to said OEM Typers.

Now, THEREFORE, it is agreed by SHEPARD and NATIONAL as follows, that:

1. This Second Supplemental Agreement shall become a part of said License Agreement dated December 19, 1955 and said Supplemental Agreement dated February 5, 1959.

2. The fixed dollar royalty called for in said Supplemental Agreement, i.e. the amount of $500.00 per Typer, will no longer apply to the manufacture and sale of OEM Typers to OEM manufacturers.

3. In place of said fixed dollar royalty a royalty of five percent (5%) shall be paid by NATIONAL to SHEPARD for each OEM Typer sold by NATIONAL to OEM manufacturers, said royalty to be based on the net selling price, after quantity discounts, of each OEM Typer manufactured and sold by NATIONAL in accordance with the license granted by said License Agreement and said Supplemental Agreement. In no event shall a royalty greater than the amount of $500.00 per OEM Typer be payable by NATIONAL to SHEPARD.

4. The parties intend that an OEM Typer shall comprise the electro-mechanical and mechanical parts, or at least a substantial portion of said parts, but shall not include the electronics for a Typer. In computing such royalty on each OEM Typer, the net selling price used shall never be less than $4,500.00 per Typer.

By letter dated September 4, 1968, NCR notified petitioner of its election to terminate the above agreements as of November 11, 1968, in accordance with the provisions of paragraph 6 of the supplemental agreement of February 25, 1959.

Such letter provided in part as follows:

We are notifying you at this time of our election to terminate the above agreements, since, as of the effective date of termination (i.e., November 11, 1968), as set forth in the above-referenced Paragraph 6, there is no question that you will have been fully paid for all property which The National Cash Register Company may have acquired from you. In addition, we have determined that printing equipment to be manufactured and sold by us, after the termination of these agreements, is not believed to be covered by any claim of a patent under which we are now licensed.

Since November 11, 1968, NCR has continued to manufacture the typer, embodying the technology furnished by petitioner under the above-described agreements, as a part of its Model 304 Computer. However, in accordance with its letter wherein it elected to terminate such agreements, it has made no further payments to petitioner since that time.

During the taxable years 1965, 1966, and 1967 the petitioner received the respective amounts of $77,020, $62,995.70, and $145,426.90 pursuant to his agreements with NCR. On petitioner's returns for such years, those amounts were reported as long-term capital gains from the "sale of patent rights."[3] Such returns were prepared by an accountant who characterized the amounts in the manner described above on the basis of his reading of the agreements between petitioner and NCR.

In the notice of deficiency the respondent determined that the amounts received by petitioner from NCR did not constitute long-term capital gains from the sale of patent rights because such amounts were not received "by reason of a sale or exchange of patent rights, or any other property interest, and that any alleged property interest involved in your transaction with the National Cash Register Company was held for sale in the ordinary course of your business."

### OPINION

The parties have agreed that both the technology and the patents involved herein were held by petitioner for a period in excess of

---

[3] On such returns depreciation deductions were claimed with respect to the aforementioned patents that issued to petitioner in 1956 and 1957.

6 months and that they were not held by him primarily for sale to customers in the ordinary course of his trade or business. Thus, the issue for decision is a relatively narrow one, namely, whether, as contended by respondent, the amounts received by petitioner constituted royalty payments pursuant to a nonexclusive license which the petitioner granted to NCR with respect to certain patents or whether, as contended by petitioner, such amounts constituted payments for technology which he sold to NCR. There does not appear to be any disagreement that if the position urged by the petitioner is the correct one the amounts received by him properly constituted capital gains (see *United States Mineral Products Co.*, 52 T.C. 177, and cases cited therein) or that if the respondent's position prevails such amounts constituted ordinary income as determined.

At the outset we must consider the respondent's contention that the petitioner's position that the disputed amounts constituted payments by NCR for the purchase of technology is contrary to the express terms of petitioner's written agreement with NCR and that we should therefore give no effect to any testimony directed to such position. In this regard the respondent calls attention to the case of *Commissioner v. Danielson*, (C.A. 3) 378 F. 2d 771, reversing 44 T.C. 549, certiorari denied 389 U.S. 858. Inasmuch as an appeal in the instant proceeding would lie to the Court of Appeals for the Third Circuit, we will follow its decisions herein where it is appropriate to do so under the principles established in *Jack E. Golsen*, 54 T.C. 742, affd. (C.A. 10) 445 F. 2d 985.

The issue in *Danielson* involved the vexing problem encountered by taxpayers when a business is sold, namely, whether a portion of the purchase price is to be allocated to a covenant not to compete on behalf of the seller with the result that such portion is ordinary income to him and deductible by the purchaser over the lifetime of the covenant, or whether such portion is to be allocated to the purchase of goodwill with the result that such portion is capital gain to the seller and not deductible by the purchaser. Because of these antithetical tax consequences to the parties involved, the manner in which the transaction is thereafter treated by such parties for tax purposes often does not comport with the terms utilized by them in their agreements of sale.[4]

---

[4] The respondent has not argued that such antithetical tax consequences are involved herein, nor has he revealed the manner in which NCR treated the disputed amounts for tax purposes. However, we may surmise, without deciding, that technology, an asset similar in nature to goodwill, probably has no ascertainable useful life in the trade or business of the party acquiring it and, therefore, that the cost of its acquisition is not subject to amortization for tax purposes. Conversely, it is clear that reasonable payments made by a nonexclusive licensee for the use of patents in his trade or business constitute currently deductible expenses. Sec. 162(a)(3), I.R.C. 1954.

In *Danielson* the taxpayers were the prior stockholders of a company who, in the agreements by which their stock was sold, had expressly allocated portions of the consideration received by them to covenants not to compete. Thereafter, they reported the full consideration as capital gains and such treatment was challenged by the respondent. In holding for the respondent the court ruled that a party to an agreement could dispute the respondent's construction thereof only by presenting evidence which would be admissible in an action between the parties to such agreement to alter such construction or by demonstrating the agreement to be unenforceable because of mistake, undue influence, fraud, or duress.

Here, both the petitioner and the respondent agree that the original and supplemental agreements between petitioner and NCR are to be read as one integrated agreement. Under this view it seems apparent to us that NCR received two things of potential value pursuant to such agreement, namely, the *rights* to manufacture under patents which related to certain aspects of petitioner's typer and the *means* to manufacture the typer itself, namely, the "complete, accurate, and up-to-date set of drawings of said 'Typer', including all of its parts and components." However, unlike the situation in *Danielson*, the agreement here involved makes no express allocation of consideration between the two. In this sense the agreement is ambiguous and we do not read *Danielson* as precluding the admission of extrinsic evidence, parol or otherwise, in such a situation. As stated by the court in *Danielson:*

it would be unfair to assess taxes on the basis of an agreement the taxpayer did not make [citation omitted]. Many factors may be relevant to the search for the agreement which the parties consciously made, including the business reality of the transaction. * * *

Indeed, because of such ambiguity, this appears to be the very situation contemplated by the court in *Danielson* where extrinsic evidence would be admissible in an action between the parties to the agreement themselves.

In construing agreements, the primary task of the court is to ascertain and, where possible, to effectuate the mutual intention of the parties. *Pickren* v. *United States*, (C.A. 5) 378 F. 2d 595; *Taylor-Winfield Corp.*, 57 T.C. 205; *Edward W. Reid*, 50 T.C. 33. While the language used by the parties in their agreement is significant, the label borne by the agreement is not determinative of its legal characterization. *Taylor-Winfield Corp.*, *supra*, and cases cited therein. And, where the agreement is ambiguous, great weight is to be accorded to the construction which the parties themselves place upon it as evidenced by their actions. *Pickren* v. *United States*, *supra*, and cases cited therein.

Here, the original agreement between petitioner and NCR was labeled a license agreement. However, as indicated hereinabove it is clear that NCR received two things of potential value pursuant to such agreement. The agreement indicated NCR's desire to acquire the right to manufacture the typer in accordance with the petitioner's designs and any disclosures in the patent applications which he had filed. The agreement further provided that petitioner would furnish NCR with the designs of the typer and that NCR would have a non-exclusive license under the patent applications. Thus, it seems clear that NCR obtained both a nonexclusive license with respect to petitioner's patent applications and the designs with which to manufacture the typer. And, though the consideration was referred to in terms of royalty, no allocation thereof was made between the two.

Turning our attention to the supplemental agreements between petitioner and NCR, as well as to the other evidence of record, it is our opinion that the amounts received by petitioner during the years in question were intended to be consideration for the technology which petitioner transferred to such company, rather than for any license under the patents which later issued. We are led to this conclusion for a number of reasons.

First, the information contained in the patent applications which related to certain aspects of petitioner's typer would not have enabled one to successfully manufacture the typer. Indeed, the parties agree that the technological development of the typer was not completed until about $1\frac{1}{2}$ years after the patent applications were filed. Moreover, as testified by petitioner, when Radio Corp. of America subsequently attempted the development of a typer on the basis of the patents which issued, such development was not successful.

Second, NCR needed to obtain the means necessary to the successful manufacture of a typer. It is not disputed that given the time and money NCR could probably have ultimately developed such means, utilizing as models the typers it purchased from petitioner in July 1955. It is equally apparent that such development would probably have delayed the final development of its Model 304 Data Processer, the computer in conjunction with which the typer was to be utilized. Thus, the acquisition by NCR of petitioner's technology obviated the need to incur the expenses of developing similar technology on its own behalf and it achieved the competitive advantage of permitting the earlier completion of its data processer.

Finally, the actions of the parties, *inter se*, subsequent to the time of their original agreement have been consistent with the view that the disputed amounts related to the technology, rather than any license under the patent applications.

Soon after the original agreement was entered into NCR requested that petitioner send it the technology here involved and he immediately complied with such request. NCR never requested that the information contained in petitioner's patent applications, which were merely pending at the time of such agreement and therefore not otherwise available to it, be so delivered. See 35 U.S.C. sec. 122.

The original agreement between the parties was amended in February 1959 by a supplemental agreement which provided a more definite base to which the royalty rate should apply and also provided both an ultimate and an optional termination date when such payments might cease. The need to clarify the royalty rate base is understandable in view of the fact that NCR was about to begin the commercial production of the typer as a part of its data processer. As testified by John J. Callahan, a patent attorney in NCR's employ who negotiated the supplemental agreement on its behalf:

The original agreement, the royalty was five percent based on the selling price of each typer.

We found it difficult to determine the amount of the royalty due. The term typer wasn't in my mind, adequately set forth in the original agreement on how much equipment this five percent may be due on. So that was one of the reasons why we negotiated negotiations with Shepard in order to arrive at something that may be definite and more easily accountable for.

The reasons underlying the provisions with respect to the termination dates of the royalty payments are somewhat less apparent. On brief the respondent urges that the ultimate termination date adopted in such agreement, namely, April 2, 1974, was merely the expiration date of one of the patents here involved and was necessary because the original agreement contained no provision with respect to the termination of payments for the use of such patents. He does not suggest why such agreement also made provision for an optional termination date, namely, November 10, 1968, which significantly preceded the expiration dates of the patents here involved.

In construing agreements where no provision has been made with respect to the termination of payments called for by such agreements, the courts have held that where such an agreement relates to a license under a patent or a copyright, the expiration of the patent or of the copyright constitutes an implied termination date. See *Warner-Lambert Pharm. Co.* v. *John J. Reynolds, Inc.*, (S.D.N.Y.) 178 F. Supp. 655, affirmed per curiam (C.A. 2) 280 F. 2d 197, and cases cited therein. However, the above-cited case clearly indicates that no such termination date may be implied where such an agreement relates to a trade secret, even when the subject of such an agreement becomes public knowledge. There, in construing an agreement which related to a

trade secret which had become public knowledge, the court stated in part as follows:

The considerations which lead the courts in the patent and copyright cases cited to limit the obligation to the term of the patent or copyright have no application here. * * *

In the patent and copyright cases the parties are dealing with a fixed statutory term and the monopoly granted by that term. This monopoly, created by Congress, is designed to preserve exclusivity in the grantee during the statutory term and to release the patented or copyrighted material to the general public for general use thereafter. This is the public policy of the statutes in reference to which such contracts are made and it is against this background that the parties to patent and copyright license agreements contract.

Here, however, there is no such public policy. The parties are free to contract with respect to a secret formula or trade secret in any manner which they determine for their own best interests. A secret formula or trade secret may remain secret indefinitely. It may be discovered by someone else almost immediately after the agreement is entered into. Whoever discovers it for himself by legitimate means is entitled to its use. [Citation omitted.]

But that does not mean that one who acquires a secret formula or a trade secret through a valid and binding contract is then enabled to escape from an obligation to which he bound himself simply because the secret is discovered by a third party or by the general public. I see no reason why the court should imply such a term or condition in a contract providing on its face that payment shall be coextensive with use. To do so here would be to rewrite the contract for the parties without any indication that they intended such a result.

In view of the above, if NCR's obligation to make payments under the original agreement related to the patents here involved, there was no need to provide, as suggested by respondent, that such payments would cease when such patents expired, because such a limitation would have been implied in the original agreement itself.

On the other hand, if NCR's obligation to make payments under the original agreement were construed as relating to the technology which petitioner transferred to it, rather than to any license under patents, NCR might well have been liable to make such payments for as long as it manufactured the typer inasmuch as the original agreement made no provision with respect to the termination thereof. To preclude such a result seems, to us, clearly to be the reason why the supplemental agreement provided for the optional termination date.

In this respect the petitioner testified to the effect that at the time the original agreement was entered into it was both his understanding and the understanding of Carl Beust, then the head of NCR's patent department, that the payments to be made by NCR would be completed after a number of years, but that they neglected to include any provision with respect thereto in the original agreement. He further testified to the effect that this was the reason why NCR instigated the negotiations which culminated in the supplemental agreement.

Callahan's testimony in this respect was to the effect that one of the reasons he initiated the negotiations which culminated in the supplemental agreement was to clarify whether NCR's obligation to make payments under the original agreement related to the patent applications named therein or to the technology which petitioner had transferred to it; that this question as to NCR's obligation was not resolved in the supplemental agreement because it made no difference to NCR at that time as to what petitioner was being paid for, as long as he was being paid; and that if it were later resolved that NCR's obligation related to the technology which petitioner had transferred to it, NCR could cease making payments as of the optional termination date because the payments made prior to that date would have adequately compensated petitioner for such technology.

Thus, in view of the above, the mere fact that the parties felt that it was necessary to provide for the optional termination date in their supplemental agreement seems clearly attributable to the position maintained by petitioner, namely, that NCR's obligation to make payments related only to the technology rather than to any license under patents. If not we cannot conceive why, at that time, the petitioner would agree to such an optional termination date which, because it preceded the expiration dates of the patents here involved by some 5 years, would so manifestly work to his pecuniary disadvantage. Moreover, the fact that NCR subsequently ceased its payments to petitioner pursuant to the optional termination provision clearly indicates that it shared the petitioner's view of its obligation. This seems particularly true in view of its continued manufacture of typers subsequent to the cessation of payments to petitioner but prior to the expiration of the patents here involved.

The respondent further contends that if the agreement between petitioner and NCR is viewed as relating to the technology which petitioner transferred to such company, rather than to the patents here involved, such agreement constituted at most a nonexclusive license of such technology and, hence, that the payments received by the petitioner thereunder represented ordinary income to him. In this respect the respondent argues, in effect, that in order to effectuate a sale of technology, rather than a mere license, the transferor must relinquish all the substantial rights of ownership in the technology; that the right to make disclosure of the technology constitutes such a substantial right therein; that under the agreement between petitioner and NCR the petitioner retained the right to disclose the technology here involved; and that petitioner, in fact, did so disclose such technology by subsequently licensing others with respect to the patents

here involved and by manufacturing and selling several typers on his own behalf.

We agree with respondent that in order to effectuate a sale of technology the purported seller must relinquish all of the substantial rights of ownership in such technology and that the right to make disclosure thereof constitutes such a substantial right. See *United States Mineral Products Co., supra.* We cannot agree, however, that petitioner retained any substantial rights in the technology here involved. The language used by the parties in the optional termination provision of their first supplemental agreement indicates to us that petitioner conveyed to NCR all of the substantial rights of ownership in such technology. Such language was to the effect that the royalties paid by NCR prior to the optional termination date would constitute full payment for the technology and that NCR was free to use such technology as it desired. And, as discussed hereinabove, the optional termination provision was the operative termination provision in the parties' agreement.

We do not, therefore, agree that the petitioner retained any rights with respect to the disclosure of the technology. By granting NCR the freedom to use the technology as it desired indicates to us that petitioner, thereby, conveyed to NCR the freedom to disclose the technology to others and that, thereafter, such company could have prevented the unauthorized disclosure of such technology. See *E. I. DuPont De Nemours & Co.* v. *United States,* (Ct.Cl.) 288 F. 2d 904. Moreover, there is no provision in the parties' agreement which we could construe as reserving any such rights to petitioner. Compare, *Taylor-Winfield Corp., supra.* His testimony was to the effect that at the time the original agreement was entered into he promised Beust that he would not disclose such technology to anyone else and we have no reason to doubt him in this respect. Furthermore, we do not believe that he subsequently disclosed such technology as argued by respondent. As pointed out hereinabove, the technology necessary to the manufacture of the typer was not revealed by the patents here involved. Thus, the subsequent licensing of others with respect to such patents did not effectuate a disclosure of such technology.

Nor, in our opinion, did the subsequent manufacture and sale of several typers by petitioner effect a disclosure of the technology necessary to the manufacture of such typers.[5] It seems, to us, fundamental

---

[5] The petitioner testified, in effect, that he considered the subsequent manufacture and sale of several typers to parties other than NCR to be within his "shop right" privileges. The "shop right rule" has technical reference to the rule that an employer has the equitable right to use an invention of his employee in a manner similar to that accorded a nonexclusive licensee when such invention was developed by the employee at the time and the expense of the employer but not at his behest. See, e.g., *United States* v. *Dubilier Condenser Corp.,* 289 U.S. 178. However, it has also been held that a "shop right" arises whenever

that the mere sale of an item, the manufacture of which is accomplished by means or methods or processes which are not already known to the general public, does not constitute the disclosure of such means or methods or processes. In an early and often-cited case, the Court of Appeals of New York held that the sale of a pump did not constitute the disclosure of the designs from which the pump was manufactured. *Tabor* v. *Hoffman*, (1889) 118 N.Y. 30, 23 N.E. 12. There the court stated in part as follows:

It is conceded by the appellant that, independent of copyright or letters patent, an inventor or author has, by the common law, an exclusive property in his invention or composition, until by publication it becomes the property of the general public. This concession seems to be well founded, and to be sustained by authority. [Citations omitted.] As the plaintiff had placed the perfected pump upon the market, without obtaining the protection of the patent laws, he thereby published that invention to the world, and no longer had any exclusive property therein. [Citations omitted.] But the completed pump was not his only invention, for he had also discovered means, or machines in the form of patterns, which greatly aided, if they were not indispensable, in the manufacture of the pumps. This discovery he had not intentionally published, but had kept it secret, unless, by disclosing the invention of the pump, he had also disclosed the invention of the patterns by which the pump was made. The precise question, therefore, presented by this appeal, as it appears to us, is whether there is a secret in the patterns that yet remains a secret, although the pump has been given to the world. * * * Can it be truthfully said that this secret [namely, the size and the shape of the patterns] can be learned from the pump, when experiments must be added to what can be learned from the pump before a pattern of the proper size can be made? As more could be learned by measuring the patterns than could be learned by measuring the component parts of the pump, was there not a secret that belonged to the discoverer, until he abandoned it by publication, or it was fairly discovered by another? If a valuable medicine, not protected by patent, is put upon the market, any one may, if he can by chemical analysis and a series of experiments, or by any other use of the medicine itself, aided by his own resources only, discover the ingredients and their proportions. If he thus finds out the secret of the proprietor, he may use it to any extent that he desires without danger of interference by the courts. But, because this discovery may be possible by fair means, it would not justify a discovery by unfair means, such as the bribery of a clerk who, in the course of his employment, had aided in compounding the medicine, and had thus become familiar with the formula. The courts have frequently restrained persons who have learned a secret formula for compounding medicines, beverages, and the like, while in the employment of the proprietor, from using it themselves, or imparting it to others to his

an owner of an invention acquiesces in its use by another without demand for compensation or notice of restriction as to the right to continue such use. See, e.g., *Gate-Way, Inc.* v. *Hillgren,* (S.D.Cal.) 82 F. Supp. 546, and cases cited therein. This latter meaning seems to us to represent more nearly the connotation intended by petitioner when he utilized the term "shop right" with respect to his use of the technology in the course of his continued refinement of the typer. That the parties did not consider such use inimical to the full commercial exploitation of the technology by NCR seems exemplified to us by their second supplemental agreement wherein petitioner agreed to lower payments per typer in order to enhance NCR's sales thereof to original equipment manufacturers.

618

injury; thus, in effect, holding as was said by the learned general term, "that the sale of the compounded article to the world was not a publication of the formula or device used in its manufacture." [Citations omitted.]

The fact that one secret can be discovered more easily than another does not affect the principle. Even if resort to the patterns of the plaintiff was more of a convenience than a necessity, still, if there was a secret, it belonged to him, and the defendant had no right to obtain it by unfair means, or to use it after it was thus obtained. We think that the patterns were a secret device that was not disclosed by the publication of the pump, and that the plaintiff was entitled to the preventive remedies of the court. While the defendant could lawfully copy the pump, because it had been published to the world, he could not lawfully copy the patterns because they had not been published, but were still, in every sense, the property of the plaintiff, who owned not only the material substance, but also the discovery which they embodied. * * *

In view of all of the above it is our conclusion that the amounts received by petitioner from NCR during the years in question represented payments for the technology which he sold to such company. In so deciding we have given careful attention to the nature of the language utilized in the agreement before us. However, the candid and, in our opinion, consistent testimony of petitioner serves to resolve the ambiguities therein in his favor. Accordingly, petitioners are entitled to treat the disputed amounts as long-term capital gains.

*Decision will be entered under Rule 50.*