GENE L. KREIDER AND ESTATE OF BERNIECE L. KREIDER, DECEASED, GENE L. KREIDER, EXECUTOR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kreider v. Commissioner
Docket No. 4389-81
United States Tax Court
T.C. Memo 1984-68; 1984 Tax Ct. Memo LEXIS 601; 47 T.C.M. (CCH) 1071; T.C.M. (RIA) 84068; February 13, 1984. John J. Vassen and Patrick B. Mathis, for the petitioners. Michael Bitner, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: Respondent determined a deficiency in petitioners' joint Federal income tax return for 1977 in the amount of $75,577.80. After concessions, two issues remain: (1) whether a payment of $631,383.80 constitutes consideration for a covenant not to compete, *602 compensation for personal services, or payment in exchange for stock, and (2) if the payment is consideration for the covenant not to compete, whether it is subject to the maximum tax provisions of section 1348. [1]
FINDINGS OF FACT Some of the facts have been stipulated and those facts are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner Gene L. Kreider, and his wife, the late Berniece L. Kreider ("the Kreiders") resided in Collinsville, Illinois at the time the petition in this case was filed. The Kreiders timely filed a joint Federal income tax return for the calendar year 1977 with the Internal Revenue Service at Kansas City, Missouri. Until October 27, 1977, petitioner Gene L. Kreider and Berniece L. Kreider were the sole shareholders of all of the outstanding shares of capital stock (200 shares) of Kreider Truck Service, Inc., an Illinois corporation. Gene L. Kreider owned 195 shares, and Berniece L. Kreider owned 5 shares of the stock. Gene L. Kreider served as President of Kreider *603 Truck Service, Inc. for 43 years. Kreider Truck Service, Inc. was a bulk carrier in the trucking industry. In addition to its operating equipment, Kreider Truck Service, Inc. owned operating rights issued by the Interstate Commerce Commission, the Illinois Commerce Commission, the Public Service Commission of Indiana, and the Missouri Public Service Commission. In 1976, the Kreiders decided to sell the business. On September 9, 1976, they entered into an agreement and a supplemental agreement with Joseph R. Behnken ("Behnken") as President of Behnken Truck Service, Inc., an Illinois corporation. The relevant portions of these agreements were amended or modified several times in 1977 and the sale was closed on October 27, 1977. Paragraph 1 of the agreement provided that Behnken Truck Service, Inc. would buy all of the sellers' right, title, and interest in all of the outstanding stock of Kreider Truck Service, Inc. for $1,200,000 in cash. Subparagraph (a) provided that if the company incurred a loss between the date of the agreement and the final closing, the amount of the loss was to be deducted from the $1,200,000 price for the stock. If a loss did occur, however, Mr. *604 Kreider had a right to void the agreement unless the buyer agreed to waive the provision that required the loss to be deducted from the stock price. [2]
The significance of this seller's escape clause becomes more apparent when considered in connection with paragraph 8. Paragraph 8 provided for an additional payment to be calculated in accordance with the business profits earned from December 31, 1975 to the date of closing. It was entitled "Covenant Not to Compete From Sellers and Additional Consideration." Subparagraph (a) provided that: (a) The Sellers agree that during the period commencing on the closing date as set forth in the Agreement and ending at the expiration of three (3) *605 years from said closing date, they will not compete directly and/or indirectly with KREIDER or the BUYER as a bulk carrier in the areas, counties, and/or states where KREIDER and/or the BUYER operate. That the phrase "to compete directly or indirectly" shall mean, in addition to the normal meanings of the words used therein, that the Sellers shall not disclose lists of customers, rates, inside information or any other pertinent information to any direct or indirect competitor of KREIDER or the BUYER; the BUYER will not hold SELLERS responsible for any information which can be obtained from public records, such as published tariffs, exhibits of operating authorities, etc.; and that the SELLERS shall not own directly or indirectly any stock or any interest in any direct or indirect competitor of KREIDER or the BUYER. That notwithstanding this Paragraph 2, [sic] SELLERS shall be free to seek employment in the transportation industry which is not in the bulk commodities business competition with KREIDER. SELLERS are also permitted to buy stock in any transportation business listed on any public stock exchange. The additional relevant portions of paragraph 8, as supplemented and *606 amended provided that: (b) In consideration for the SELLERS covenanting not to compete the BUYER agrees to pay to the SELLERS an amount equal to the accumulated after-tax profit of KREIDER determined in accordance with the Internal Revenue Code and all rules and regulations promulgated thereunder for the said period from 12-31-75 to closing to be paid on or before closing in cash. * * * (c) In addition to the $1,200,000 to be paid for the purchase of the stock in paragraph 1 above, the SELLERS shall retain the right to pay themselves as compensation or as a covenant not to compete the net profit before taxes (unless the compensation to be paid herein shall represent a tax deduction for KREIDER then it shall be the net profit after taxes) made by KREIDER from December 31, 1975 through and including the date of closing. * * * * * * (e) It is understood by all parties hereto that the total amount to be paid to the SELLERS under the provisions of paragraph 8 representing the compensation to be paid for the covenant not to compete shall not exceed an amount equal to the net before Federal and State taxes profit of KREIDER earned during the period from 12-31-75 to closing without *607 taking into consideration the payments to be made under paragraph 8. The supplemental agreement further provided that: Paragraph 8 * * * shall be interpreted to mean that the SELLERS shall receive a minimum of but no greater than the net profit before taxes, whether paid in the form of covenant not to compete and/or compensation. * * * Thus, in the event of a loss, the Kreiders would receive no additional payment under paragraph 8. Paragraph 1, however, would give Mr. Kreider the right to void the entire agreement unless the buyer agreed to pay the full $1,200,000 stock price, unreduced by the amount of the loss. Paragraph 14 of the agreement stated that in the event that the sale was closed on or before December 31, 1976, Mr. Kreider would remain an employee at his current salary through December 31, 1976. The supplemental agreement provided, however, that if the date of closing occurred after January 1, 1977, then the employment term would be extended by one year, but that the amount of salary paid from the date of closing through December 31, 1977 would be deducted from the stock price. Mr. Kreider agreed to sell his business for $1,200,000 even though a recent appraisal *608 of his equipment led him to believe that his business was worth two million dollars, because he believed he actually would receive a much higher amount through the provisions of paragraph 8. Mr. Kreider continued to operate the business from the date he signed the agreement in 1976 until the closing date on October 27, 1977, working about 13 hours a day, 6 days a week, and some Sundays. During this period he continued to receive his regular salary. In addition to the $1,200,000, Behnken Truck Service, Inc. paid the Kreiders $631,383.80. The parties have stipulated that this amount represents the before-tax profit of Kreider Truck Service, Inc. for the period January 1, 1976 to October 27, 1977. The after-tax profit of Kreider Truck Service, Inc. for the same period was $456,585.64.No agreement was made on whether the payment would be characterized as earnings from the covenant not to compete or compensation for services. Mr. Behnken was aware of Mr. Kreider's experience in the industry. He wished to acquire the stock of Kreider Truck Service, Inc. because it was a fairly successful business, and he was concerned about competition from Mr. Kreider after the sale of the business. *609 Both petitioners and the buyer reported the supplemental payment of $631,383.80 as allocable to a covenant not to compete for the year 1977. Petitioners treated the income from the covenant not to compete as personal service income subject to the maximum tax provisions of section 1348. Respondent determined a deficiency in the amount of $75,577.80. In the notice of deficiency, respondent asserted that income from a covenant not to compete is not considered personal service income within the meaning of section 1348. Petitioners did not file an amended return, but rather chose to argue before this Court that the payment should be characterized as attributable to the sale of stock, or compensation for services. In the alternative, petitioners argue that earnings from a covenant not to compete should be subject to the maximum provisions of section 1348. OPINION The Kreiders signed a document stating that they agreed to sell all of their right, title, and interest in the stock of Kreider Truck Service, Inc., for $1,200,000. The parties have stipulated that in addition to the price of $1,200,000, the Kreiders were paid $631,383.80 "pursuant to paragraph 8 of the agreement, *610 " which is entitled "Covenant not to Compete and Additional Compensation." The Kreiders reported the $631,383.80 as income from the covenant not to compete on their 1977 tax return. Now, however, petitioners argue that the sum actually represents additional payment for the stock, or alternatively, compensation for services. If the payment was part of the amount paid for stock, petitioners would realize a capital gain. Major v. Commissioner,76 T.C. 239, 245 (1981). If the payment was for services, it would constitute ordinary income, but the provisions of section 1348 would set a 50 percent ceiling on the tax rate. [3]
On these facts we have no difficulty in concluding that the $631,383.80 payment was not additional payment for stock. This Court has held that: [W]here one alleges that an allocation is actually other than that contained in a contract, that party must prove it beyond a mere preponderance *611 of the evidence--he must present" strong proof" that that allocation is correct based on the intent of the parties and the economic realities. [Major v. Commissioner,supra at 247.] See Schulz v. Commissioner,194 F.2d 52, 55 (9th Cir. 1961), affg. 34 T.C. 235 (1960); Peterson Machine Tool,Inc. v. Commissioner,79 T.C. 72, 81 (1982); Lucas v. Commissioner,58 T.C. 1022, 1032-33 (1972). This Court has applied the strong proof standard where, as in this case, appeal would lie to the Seventh Circuit. Major v. Commissioner,supra.[4]
*612 The parties agree that the amount in issue was paid in accordance with paragraph 8 of the agreement. There is nothing in paragraph 8 suggesting that anyone ever contemplated allocating any portion of the additional payment to the purchase price of the stock. Indeed, Mr. Kreider admitted at trial that the parties had agreed upon the $1,200,000 figure as the final purchase price for the stock: "I was looking towards something like $2 million for the business, but after several months of negotiation, we agreed upon $1,200,000." Moreover, petitioners have presented no evidence that either party intended to allocate more than $1,200,000 to the stock price. Indeed, the Kreiders reported the $631,383.80 payment on their tax return as income from the covenant not to compete. It was not until they learned of the tax consequences that petitioners first contended the payment should be characterized differently. This Court has considered the time at which a party has learned of the tax consequences as a relevant factor in ascertaining intent. See Major v. Commissioner,supra at 250. The contract clearly states that $1,200,000 will be paid in exchange for all right, *613 title, and interest in the stock. If a higher price had been contemplated, the parties likely would have discussed the matter during negotiations. Cf. Lazisky v. Commissioner,72 T.C. 495, 503-04 (1979), affd. on another issue sub nom. Magnolia Surf, Inc. v. Commissioner,636 F.2d 11 (1st Cir. 1980). In short, we have been presented with no evidence that the parties intended to allocate to the stock price more than the amount stated in the contract. Nor have petitioners demonstrated that allocating the payment to the covenant not to compete and/or compensation for services [5] does not comport with economic reality. Petitioners have not presented persuasive evidence that the $1,200,000 received by the Kreiders for their stock was inadequate. Cf. Wager v. Commissioner,52 T.C. 416, 419 (1969). Counsel for petitioners concede on brief that: The price of $1,200,000 represented the agreed value of Kreider at the time the "Agreement" was entered into by the parties, based upon the adjusted book value of Kreider as of December 31, 1975. That Gene Kreider was not satisfied with this price is not enough to induce the Court to *614 reconstrue the contract. Whether the payment of $631,383.80 constitutes compensation for the covenant not to compete or compensation for services is a more difficult question. The contract itself is highly ambiguous. Although different subparagraphs designate different amounts and support different allocations, a ceiling on the total amount to be paid is fixed at the amount calculated under one of the subparagraphs. Subparagraph 8(b) of the agreement states that as consideration for the covenant not to compete the buyer agrees to pay to sellers the after-tax profit accumulated from December 31, 1975 to the date of closing. Subparagraph 8(c) states that in addition to the $1,200,000 to be paid for the purchase of stock, "the sellers shall retain the right to pay themselves as compensation or as a covenant not to compete the net profit before taxes" as accumulated *615 during the same period. (Emphasis added.) Subparagraph (e) states that the total amount paid pursuant to paragraph 8 representing compensation for the covenant not to compete shall not exceed the net profit before taxes earned during the same period. The supplemental agreement provides that, pursuant to paragraph 8, "the sellers shall receive a minimum of but no greated than the net profit before taxes, whether paid in the form of covenant not to compete and/or compensation." Paragraph 8 of this contract thus does not clearly characterize the payment it contemplates. Where the allocation in a contract is ambiguous, and the parties merely seek to construe its terms, the strong proof standard is inapplicable. Peterson Machine Tool, Inc. v. Commissioner,79 T.C. 72, 82. Peterson Machine Tool, Inc. involved a contract which made no specific allocation of a purchase price to the covenant not to compete, yet stated that the parties intended the covenant to be considered as "materially significant and essential to the closing." 79 T.C. at 82. The court stated: *616 Thus, while it is unclear from the contractual terms what specific amount should be allocated to the covenants not to compete, some allocation is surely provided for. Under these circumstances, application of the "strong proof" doctrine is inappropriate. * * * Neither party seeks to vary the terms of the contract. They both merely attempt to construe an obviously ambiguous term of the contract in a light most favorable to their respective causes. This being the case, both Peterson, Inc. and the sellers bear the burden of proving that their respective interpretations of the words "material portion" and "materially significant" are correct by a mere preponderance of the evidence. * * * [Peterson Machine Tool, Inc. v. Commissioner,supra at 82.] The question before the Court here, then, is whether petitioners have shown by a preponderance of the evidence that the disputed payment is properly allocable to compensation for services. The evidence bearing on intent and the economic reality of the transaction goes both ways. On one hand, the specificity of the covenant not to compete provision indicates that the parties thought it important. The covenant *617 specifies exactly what the sellers may do: they may seek employment anywhere in the transportation industry so long as the employer is not in the bulk commodities business competing with Kreider Truck Service, and they may buy stock in any transportation business listed on any public stock exchange. The covenant speaks as well to what the sellers may not do: they may not disclose lists of customers, rates, or inside information to any direct or indirect competitor, and they may not own stock or any interest directly or indirectly in any direct or indirect competitor of Kreider Truck Service or the buyer. In addition, the covenant makes clear that sellers will not be held responsible for any information that can be obtained from public records. The terms of the covenant thus reveal that the parties did not doubt its importance. This, coupled with the fact that Mr. Kreider had long experience in the industry and represented a formidable competitive force leads us to conclude that the covenant had significant economic value. Moreover, the language of paragraph 8 indicates that some allocation to the covenant was indeed intended although it does not make clear the specific amount. *618 See Peterson Machine Tool, Inc. v. Commissioner,supra at 82. On the other hand, the evidence supports a finding that some amount of compensation for services was both intended and economically reasonable. Testimony at trial revealed that the period between the date of the first agreement and the final closing would be a crucial one for Kreider Truck Service. The closing hinged upon approval from various transportation authorities of permit transfers, a process which required hearings of unknown duration. Mr. Kreider testified that he knew that certain permits he had been seeking to acquire for ten years were to be granted during this period. Good business sense logically would impel the buyers to provide Mr. Kreider with the incentive to put forth his best efforts during this crucial period to exploit these new opportunities. We thus find that some allocation of the $631,383.80 payment to compensation for services would comport with economic reality as well. That the parties intended some allocation to compensation is also clear from the contract. Although the precise allocation was left open, the intent to treat the payments as compensation is clear *619 from the fact that the formula under which the payment was computed was based upon the time period in which Mr. Kreider performed the services. Mr. Kreider's testimony, moreover, convinces us that he considered at least a portion of the payment to represent compensation for his services. Since we find that allocations to the covenant and to compensation for services were both intended and economically reasonable, we hold that the $631,383.80 payment should be bifurcated accordingly. See Peterson Machine Tool, Inc. v. Commissioner,79 T.C. 72, 86; Kinney v. Commissioner,58 T.C. 1038, 1044 (1972). Higher courts have recognized the need for approximation where complete accuracy is impossible. In Levine v. Commissioner,324 F.2d 298 (3d Cir. 1963), affg. a Memorandum Opinion of this Court, for example, the Third Circuit Court of Appeals stated: The Tax Court in its judgment did not accept in full the total presented either by the sellers or buyer for the good will and covenant respectively. It did agree that both items were valuable. In those circumstances to allow nothing for the good will or for the covenant or for both *620 would have been at the least inconsistent. At the same time one hundred per cent accuracy in fixing the respective amounts was impossible. So the court made the closest approximation it could. See Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930). [324 F.2d at 302.] See also Kinney v. Commissioner,supra at 1044. Based on a thorough review of the record, we find that one-third of the $631,383.80 payment is allocable to compensation for services, and that two-thirds is allocable to the covenant not to compete. Respondent argues that the entire payment should be characterized as payment for the covenant because the payment was made by the buyers to the sellers, rather than by the sellers to themselves. It is true that paragraph 8(c) states that "the sellers reserve the right to pay themselves * * *" while paragraph 8(b) provides that "the Buyer agrees to pay to the Sellers * * *" the various amounts. It would be impossible, however, for the sellers to pay themselves in accordance with the formula in paragraph 8(c) since the period for which net earnings are computed ends upon the date of closing. Once the closing *621 takes place, the sellers no longer would have the power to make the payments to themselves. In any event, we find that respondent's distinction is not significant in determining the true character of the payment. Respondent relies upon the fact that both parties reported the payment on the tax returns as relating to the covenant not to compete to show that they intended this allocation. Statements made on a tax return are not determinative, however, where cogent evidence to the contrary exists. This Court is convinced that in spite of petitioner's statements on their return, a portion of the payment in truth represented compensation for services. In addition, respondent maintains that no allocation to compensation for services is reasonable since Mr. Kreider continued to draw his regular salary while he operated the company. Respondent fails to note, however, that the supplemental agreement required the amount of salary paid in 1977 to be subtracted from the stock price. In reality, then, Mr. Kreider obtained no compensation for his services in 1977 other than whatever is allocated *622 under paragraph 8. Petitioners, on the other hand, argue that the entire payment should be characterized as compensation for services. In support, petitioners rely upon Mr. Kreider's insistence upon receiving some compensation for continuing to operate the company. While this fact supports some allocation to compensation, it does not prove that the entire net earnings figure should be so allocated. Petitioners further assert that the entire payment represents compensation because the covenant not to compete lacks economic substance. They point to Mr. Kreider's testimony that he would have agreed to the covenant without consideration since he planned to retire, and also to the fact that the Kreiders could very well have gone uncompensated had the company failed to produce net earnings. Mr. Kreider's testimony about what he might have agreed to carries little weight with this Court. We are concerned with an actual agreement, not some hypothetical one. The timing of Mr. Kreider's statement further lowers its credibility. We have been presented with no evidence that Mr. Kreider informed the buyer during negotiations that he would agree to the convenant without consideration. *623 To profess such a willingness now is hardly impressive, particularly since the agreement suggests the covenant was part of the consideration bargained for. And while petitioners' second point carries more force, it, too fails to convince us that the covenant does not comport with economic reality. It is true that the payment formula in paragraph 8 of the agreement could have produced no compensation for the covenant. In that event, however, no payment under that clause would have been made. Moreover, Mr. Kreider's testimony indicates that he fully anticipated substantial net earnings during the period at issue because he knew that certain permits he had been pursuing for 10 years were about to be granted. Moreover, paragraph one of the agreement gave Mr. Kreider the right to void the entire agreement in the event of a loss (under certain circumstances); thus the only way Mr. Kreider would have been irrevocably bound by the covenant without receiving compensation would have been if net earnings had been exactly zero. Petitioners also argue that the provisions of paragraph 8(c) permit the sellers to characterize the payment as either compensation or earnings from the covenant. *624 We see no such evidence in the contractual language, nor does the testimony at trial support such a finding. Petitioners argue as a final alternative position that income from a covenant not to compete should be deemed "personal service income" subject to the maximum tax provisions of section 1348 as in effect in 1977. In this connection, we must assume that petitioners attack the validity of section 1.1348-3(a)(1)(i), Income Tax Regs., which plainly and unequivocally provides: For purposes of section 1348 and the regulations thereunder, the term "earned income" * * * also does not include amounts received for refraining from rendering personal services or engaging in competitive activity or amounts received as consideration for the cancellation of an employment contract. Petitioners take the position that the payments made to a covenantor are in lieu of the potential income he might earn through the exercise of his business knowledge, and therefore that the source of the payments to one who covenants not to compete are his personal skills. Petitioners *625 argue that the fact that such income is not generated by a taxpayer's current personal labor should not exclude it from the protection of section 1348, because other types of income that qualify for section 1348 treatment equally represent the fruits of prior labor. Among those income items listed in the statute and applicable regulations are "amount[s] received as a pension or annuity" section 1348(b)(1)(A); "bonuses," "amounts includable in gross income under section 83," and "commissions on sales or on insurance premiums", section 1.1348-3(a)(1)(i)(A), Income Tax Regs.; "prizes and awards in recognition of personal services," section 1.1348-3(a)(1)(i)(C), Income Tax Regs., and gains and net earnings from the disposition of property created by personal efforts; section 1.1348-3(a)(1)(i)(D), Income Tax Regs.[6]
*626 While petitioners' argument has force, they will need "more than a plausible policy argument to prevail here." See National Muffler Dealers Ass'n., Inc. v. United States,440 U.S. 472, 488 (1979). "Treasury regulations 'must be sustained unless unreasonable and plainly inconsistent with the revenue statutes,' Commissioner v. South Texas Lumber Co.,333 U.S. 496, 501 (1948)." Stephenson Trust v. Commissioner,81 T.C. 283, 287 (1983). The regulation at issue here is not "plainly inconsistent" with section 1348. As in effect in 1977, section 1348(b)(1)(A) defined the term "personal service income" in relevant part as "any income which is earned income within the meaning of * * * section 911(b) * * *." Section 911(b) defined "earned income" as "wages, salaries, or professional fees, and other amounts received as compensation for personal services actuallyrendered * * *." (Emphasis added.) While a good argument can be made for a rule different from the regulation consistent with the policy underlying section 1348, we do not act *627 as a committee to revise the regulations. The Supreme Court has clearly described the limits of our role in this realm: Alternatives to the Commissioner's * * * rule are of course available. Improvements might be imagined. But we do not sit as a committee of revision to perfect the administration of the tax laws. Congress has delegated to the Commissioner, not to the courts, the task of prescribing "all needful rules and regulations for the enforcement" of the Internal Revenue Code. 26 U.S.C. sec. 7805(a). In this area of limitless factual variations, "it is the province of Congress and the Commissioner, not the courts, to make the appropriate adjustments." Commissioner v. Stidger, 386 U.S. 287, 296. The role of the judiciary in cases of this sort begins and ends with assuring that the Commissioner's regulations fall within his authority to implement the congressional mandate in some reasonable manner. * * * [United States v. Correll,389 U.S. 299, 306-07 (1967) (fn ref. omitted).] The regulation before us is not plainly inconsistent *628 with the statute, and clearly precludes petitioners' argument. For these reasons, we reject petitioners' argument that the regulation is invalid. Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended and in effect for the year in issue.↩
2. The language in the agreement is often difficult to interpret. For instance, paragraph 1(a) provides that: (a) If a loss occurs for KREIDER, GENE KREIDER can void this agreement unless BUYER agrees to waive this provision during the period from January 1, 1976 through the date of closing (hereinafter referred to as "Said Period"), the amount of any such loss shall be deducted from the selling price for the stock, namely One Million Two Hundred Thousand Dollars ($1,200,000.00). * * *↩
3. Sec. 1348↩ was repealed by Pub. L. 97-34, 95 Stat. 178-179, Economic Recovery Tax Act of 1981, effective for taxable years beginning after December 31, 1981.
4. In Wilson Athletic Goods Manufacturing Co. v. Commissioner,222 F.2d 355, 357 (7th Cir. 1955), revg. a Memorandum Opinion of this Court, the Circuit Court stated that "it was the duty of the Tax Court and is our duty here to ascertain the true intent, insofar as tax consequences are concerned. Consequently, it is immaterial whether the contract did or did not define a specified amount as the value of the covenant." In Major v. Commissioner,76 T.C. 239, 249↩ (1981), we stated "[i]n light of the preference in this Court to apply the strong proof standard as applied to the intention of the parties, we shall proceed on the basis that this is acceptable to the Seventh Circuit." We will proceed likewise herein.
5. For purposes of determining whether the supplemental payment constituted additional purchase price for the stock, the items in paragraphs 8 shall be discussed as a unit. Whether the $631,383.80 payment is allocable to the covenant not to compete or to compensation for services shall be addressed infra.↩
6. In addition, petitioners note that Rev. Rul. 78-359, 1978-2 C.B. 220 holds that the ordinary income realized by a corporate employee at the time of exercise of stock option rights or stock appreciation rights under a nonqualified stock option plan constitutes personal service income qualifying for treatment under sec. 1348↩.