JOHN M. SMITH AND EILEEN A. SMITH, PETITIONERS *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 15864–81.    Filed April 30, 1984.

*Robert B. Durham, Jr.,* for the petitioners.
*J. Leon Peace,* for the respondent.

DAWSON, *Chief Judge:* Respondent determined a deficiency in petitioners'[1] Federal income tax in the amount of $4,422 for the taxable year 1978. Due to concessions by the parties, the only issues remaining for decision are (1) whether $14,974 of a total sum of $24,974 received by petitioner pursuant to an agreement and addendum is eligible for capital gains treatment, and (2) if that amount is not eligible for capital gains treatment, whether petitioner is liable for self-employment tax in 1978.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of fact, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioner John M. Smith and Eileen A. Smith (hereinafter referred to as Eileen) resided in Philadelphia, Pa., at the time that the petition was filed in this case. Petitioner and Eileen filed a joint return for the taxable year 1978 with the Internal Revenue Service Center at Philadelphia, Pa.

In February 1977, petitioner helped establish Progress, Inc. (hereinafter referred to as Progress or corporation), a corporation organized and operating under the laws of Pennsylvania. Progress maintained its principal place of business in Philadelphia, Pa., during 1977 and 1978. Progress was a calendar year taxpayer and reported its income and deductions in accordance with the cash method of accounting.

Petitioner joined Richard K. Schmitt, Kenneth E. Benton, and John C. Becker in the formation of Progress. Each of the incorporators received 25 percent of the stock of Progress in exchange for their contributions of $10,000. For Federal tax purposes, Progress was conducted as a corporation defined

---

[1] Eileen A. Smith did not participate in either the negotiations regarding the transactions at issue or in the preparation of the return. Mrs. Smith is a party to this action only by virtue of having filed a joint return with John M. Smith, her husband, for the taxable year in question. Hereinafter, reference to "petitioner" shall refer to petitioner John Smith only.

under subchapter C of the Internal Revenue Code of 1954 as amended.

In 1978, Progress engaged in the business of procuring buyers and sellers of real property as a real estate brokerage firm. Progress maintained a number of commissioned salespersons, of whom six were actively selling during 1978. The corporation treated these six salespersons as independent contractors. These independent salespersons were paid solely on a commission basis. For a listing and sale of a property, they received 30 percent of the gross sales profits due Progress. Their remuneration for a sale of real estate without a listing was 25 percent of the gross sales profits.

Progress also employed its four shareholders. Schmitt was president, petitioner was secretary, and Benton was sales manager.[2] No written contract of employment was executed between the shareholders and the corporation.

All gross sales profits earned by petitioner, Becker, Schmitt, Benton, and the other independent salespersons were deposited with Progress. From this amount of gross sales profits inuring to Progress, the corporation paid its operating expenses, including remuneration due the six independent salespersons. On its Federal income tax return for 1978, Progress deducted such payments as "commission paid out."

Irrespective of their individual sales, the four shareholders distributed the corporation's remaining sales profits in four aliquot shares at the end of each taxable year. Since the amount of these distributions was directly tied to the gross sales profits earned by Progress, these distributions would fluctuate according to the annual success of the corporation's business. These amounts divided among the shareholders were deducted by Progress as "commission paid out" on its tax return for 1978. Progress also paid Benton and Schmitt an additional $3,000, each, as compensation. In 1978, the corporation deducted a total of $97,431 as "commission paid out" and $6,000 for the compensation paid to Schmitt and Benton.

The following amounts appeared on Progress' 1978 Federal income tax return:

---

[2]The record contains no facts as to Becker's employment responsibilities.

| Gross sales profits | Taxable income prior to NOL deduction |
|:---:|:---:|
| $157,379 | $5 |

| NOL deduction | Taxable income/(loss) |
|:---:|:---:|
| $8,213 | ($8,208) |

During the latter part of 1977, a personality conflict developed between petitioner and Becker and the other two shareholders, Schmitt and Benton. Early in 1978, the four shareholders began discussions on how to divide up the business. The parties agreed that petitioner and Becker would sell their respective interests in Progress in such a manner as to leave Schmitt and Benton as the only remaining shareholders.

The parties sought help from several attorneys to draft a sale-of-stock agreement. Finding several drafts unsuitable, the shareholders composed their own agreement by selecting portions from these drafts in a "cut and snip" fashion. On March 2, 1978, an agreement (hereinafter referred to as agreement) was executed by the four shareholders and Progress. The agreement provided, in part, the following:

### AGREEMENT

AGREEMENT made this 2nd day of March, 1978, by and between JOHN SMITH, * * * and JOHN BECKER, * * * (hereinafter individually referred to as 'SELLER' and together referred to as 'SELLERS') and RICHARD K. SCHMITT, * * * and KENNETH BENTON, * * * (hereinafter individually and together referred to as 'BUYER') and PROGRESS, INC., a corporation organized and existing under the laws of the Commonwealth of Pennsylvania (hereinafter referred to as 'CORPORATION').

WITNESSETH, whereas CORPORATION is organized for the purpose of engaging in the real estate business; and whereas SELLERS and BUYERS are the owners of all the outstanding shares of stock of CORPORATION; and whereas, BUYER desires to purchase from SELLERS and SELLERS desire to sell to BUYERS all of the shares of stock of CORPORATION owned by SELLERS; and whereas, *CORPORATION owes each SELLER commissions in the amount of Fourteen Thousand, Seven Hundred, Fifty ($14,750.00) Dollars.*

NOW, THEREFORE, in consideration of the mutual convenants and promises contained herein, the parties hereto, intending to be legally bound, hereby agree as follows:

1. SELLERS agree to sell to BUYER and BUYER agrees to purchase from SELLERS all shares of corporation stock owned by SELLERS as set forth in this Agreement.

*2. The consideration for the purchase of corporation stock referred to in number one hereinabove shall be Seventeen Thousand ($17,000.00) Dollars. BUYER shall pay Eight Thousand, Five Hundred ($8,500.00) Dollars to each SELLER* by cash or certified check on the execution of this Agreement.

*3. CORPORATION and BUYER agree to pay to each SELLER the commissions due each SELLER as follows:*

*(a) COMMISSIONS are due each SELLER as same are earned by CORPORATION and/or BUYER.* Such payments are to begin promptly, commencing March 1, 1978. CORPORATION may retain the first Two Thousand ($2,000.00) Dollars of gross income each calendar month. CORPORATION and BUYER shall give immediate notice to SELLERS that such gross income has been attained within twenty-four (24) hours of such attainment. Thereafter CORPORATION and BUYER will cause Fifty (50%) Percent of each commission dollar earned in the remaining part of the calendar month to be paid to SELLERS, and so on for each calendar month thereafter until *CORPORATION and BUYER have paid to SELLERS the sum of Twenty-nine Thousand, Five Hundred ($29,500.00) Dollars.* Payment hereunder is to be disbursed directly to SELLERS at the settlement table by the insuring Title Company, as each settlement is made during any calendar month. For the purposes of this Agreement, gross income is defined as all income (including, but not limited to, commissions, conveyancing fees, insurance commissions, rental income, rental commissions, etc.) received by CORPORATION and/or BUYER less commissions paid to salesmen other than BUYER employed by CORPORATION as independent contractors.

(b) CORPORATION and BUYER shall furnish to SELLERS on a weekly basis a three-month schedule of anticipated settlements until such time as the total balance of *commissions owed by CORPORATION and BUYER to SELLERS* shall be fully paid, indicating thereon, the names of the parties, times, dates and places of settlements and commissions and/or conveyancing charges anticipated. SELLERS shall have the right to attend each such settlement.

(c) CORPORATION and BUYER shall provide SELLERS, until such time as the balance of commissions owed to SELLERS shall be fully paid, a monthly statement of all settlements made during the preceding month, indicating thereon the names of the parties to the settlements, the date of the settlements, all gross income received or earned by BUYER and/or CORPORATION in said month and commissions paid to all salesmen of CORPORATION.

(d) In the event of CORPORATION's and/or BUYER's default, all remaining sums then due and owing to SELLERS shall advance forthwith, and the entire balance remaining shall be paid immediately. Should a default occur, CORPORATION and BUYER hereby assign to SELLERS all the CORPORATION's and/or the BUYER's right, title and interest in any and all settlements then scheduled or to be scheduled. In the event that CORPORATION and/or BUYER becomes embarrassed or insolvent, or makes an assignment for the benefit of creditors, or if a petition in bankruptcy is filed by or against the CORPORATION or BUYER, or a bill in equity or other proceeding for the appointment of a receiver for the CORPORATION or BUYER is filed, or if proceedings for reorganization or

for composition with creditors under any State or Federal law be instituted by or against CORPORATION or BUYER, or if the real or personal property of the CORPORATION or BUYER shall be sold or levied upon by any Sheriff, Marshall or Constable; then and in any or either of said events, there shall be deemed to be a breach of this Agreement, and thereupon ipso facto and without other action by SELLERS, this Agreement should be deemed to be in default.

[Emphasis added.]

The terms of the agreement were reached after arm's-length negotiations between the four shareholders in light of achieving maximum tax benefits for all parties involved. The buyers wanted to use corporate funds to complete the buy-out; the sellers wanted capital gains treatment on the entire proceeds from their sale of stock; and the remaining shareholders wanted to earmark corporate funds to be used as "commissions due" to enable the corporation to deduct its payments to the sellers.

At the time of the execution of the agreement, there were as yet unpaid gross sales profits owed to Progress from completed sales.[3] There also were sales in progress that were to be finalized in the then near future.

Between March and August of 1978, Progress experienced cash flow problems. At that time, neither Progress nor Schmitt and Benton had complied with provisions in the agreement. Specifically, the buyers did not keep the required weekly schedules of anticipated real estate closings and of payments owing to Progress that were both to be furnished to the sellers. Moreover, Progress was delinquent in making payments to the sellers according to the terms of the agreement. To attempt to rectify this situation, on August 18, 1978, the original four shareholders executed an addendum to the March 2, 1978, agreement. It provided the following:

It is understood and agreed that as of this date, August 18, 1978, *John M. Smith and John C. Becker accept Ten Thousand Dollars ($10,000.00) as full and final payment for all outstanding shares of stock of Progress Corporation.* John M. Smith and John C. Becker agree to give up all claims to [sic] Progress, Inc. Realtors and Richard K. Schmitt and Kenneth E. Benton. Richard K. Schmitt and Kenneth E. Benton have no further obligation or endebtedness [sic] to John M. Smith or John C. Becker.

---

[3]The record contains no facts as to the exact dates of these completed sales.

This agreement, dated August 18, 1978, is in reference to the agreement made and signed on March 2, 1978.

This agreement is payment in full and satisfies all debts and all obligations owed to John M. Smith and John C. Becker by Kenneth E. Benton and Richard K. Schmitt.

[Emphasis added.]

The addendum was signed by the original four shareholders, but the corporation was not a party to the addendum. Petitioner received the $10,000 payment recited in this addendum. Both Schmitt and Benton each personally borrowed funds in order to finance this payment. However, Progress deducted the $10,000 as "commission paid out."

The parties agree that, in total, petitioner received $24,974 in 1978 pursuant to the agreement and addendum.[4] Progress filed a Form 1099 with the Internal Revenue Service indicating that Progress had made payments of $14,974 of "commissions" to petitioner and deducted this amount as part of its overall deduction for "commission paid out" on its 1978 Federal income tax return. Progress did not pay a cash or stock dividend in 1978.

On their joint Federal income tax return for 1978, petitioners reported $14,974 as long-term capital gain ($24,974 in proceeds from the sale of petitioner's 25-percent interest in Progress, less his basis in the stock of $10,000, or $14,974).

Respondent issued a notice of deficiency disallowing capital gains treatment for the reported $14,974 gain. Respondent determined that $10,000 was paid as the purchase price for petitioner's stock. He also determined that $14,974 was paid by Progress as commission income and, as such, must be reported by petitioner as wages. Consistent with this position, respondent determined that petitioner is liable for self-employment tax in 1978 on the $14,974.

---

[4]We are not able to find from the record the exact amounts that petitioner received separately from Schmitt and Benton, on the one hand, and Progress, on the other hand. All that we can find is that Schmitt and Benton paid petitioner between $8,500 and $10,000, and Progress, at least nominally, paid petitioner between $14,974 and $16,474 ($1,500 + $14,974). The difference between the amounts paid by Schmitt and Benton and Progress is attributable to periodic payments from Progress to petitioner in partial fulfillment of the corporation's obligation under the agreement. We do not intend to resolve the incongruity between these numbers.

OPINION

The question before us is whether the allocation in a written agreement of a part of the purchase price of a shareholder's interest in a corporation to "commissions" is determinative for Federal income tax purposes. Stated differently: What is the appropriate treatment of the $24,974 which petitioner received pursuant to the agreement and addendum?

The agreement provided that petitioner would sell his 25-percent interest in Progress to Schmitt and Benton for $8,500. The agreement also provided that Progress and Schmitt and Benton would pay petitioner $14,750 as "commissions due" to petitioner.[5] An addendum executed 5 months subsequent to the agreement acknowledged petitioner's receipt of $10,000 as full and final payment for his stock in the corporation and for giving up all claims against the buyers. Due to the corporation's cash flow problems, Schmitt and Benton each personally borrowed funds to finance this $10,000 payment.

Respondent contends that $14,974 received by petitioner represents earnings from self-employment as evidenced by the clear and unambiguous terms of the agreement and the Form 1099 issued by Progress to petitioner. Respondent further contends that, according to *Commissioner v. Danielson*, 378 F.2d 771 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965),[6] the terms of the agreement are to be upheld for income tax purposes. He further argues that the fact that the wording and terms of the addendum and agreement do not completely mesh is not sufficient to show that a mutual mistake transpired.

Petitioner, on the other hand, contends that, notwithstanding arm's-length negotiations and provisions to the contrary, Schmitt, Benton, and Progress had actually bargained to purchase his 25-percent interest in Progress for approximately $25,000 rather than for $8,500, plus "commissions due" to petitioner. That is, petitioner asserts that the agreement was merely a financing tool to enable Schmitt and Benton to use

---

[5]The Form 1099 issued by Progress indicated that total "commissions" of $14,974 had been paid to petitioner.

[6]An appeal from this decision would lie in the U.S. Court of Appeals for the Third Circuit. Insofar as applicable, we are thus constrained by *Golsen v. Commissioner*, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), to apply the principle of law enunciated by the Third Circuit, sitting en banc, in *Commissioner v. Danielson*, 378 F.2d 771 (3d Cir. 1967).

corporate funds to help effectuate the buy-out. Petitioner argues that a mutual mistake occurred with respect to the amount of the purchase price of the stock intended by the parties to the agreement. Petitioner supports his contentions by pointing to the lack of congruity between the terms of the addendum and agreement and the fact that he had no legal right to the commissions.

We think the language of the agreement[7] is permeated with ambiguity and, accordingly, the *Danielson* rule does not apply.

*Danielson* involved the purchase and sale of a small loan company. We found in that case that the parties to the transaction had expressly agreed to allocate a specific portion of the purchase price to covenants not to compete executed by the selling stockholder. 44 T.C. at 554. Each selling stockholder nevertheless reported the entire amount of these allocations as capital gain from the sale of goodwill. The Commissioner disallowed capital gains treatment for that portion of the gain corresponding to the consideration for the covenants not to compete. 44 T.C. at 555. Based upon the "strong proof" standard,[8] we ruled in favor of the taxpayer due to our factual findings that the covenants involved had no independent basis in fact or arguable relationship with business reality. 44 T.C. at 556. See *Schulz v. Commissioner*, 294 F.2d 52, 55 (9th Cir. 1961), affg. 34 T.C. 325 (1960). The Third Circuit reversed this Court on the basis that:

a party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc. [378 F.2d at 775.]

In order to hold contracting parties to their written agreement, the *Danielson* rule impliedly requires an unambiguous

---

[7]Hereinafter, we shall treat the original agreement and addendum as one agreement. Therefore, unless otherwise stated, references to "agreement" are to the original agreement and addendum, combined.

[8]When one party to a contract attempts to prove that an allocation made in that contract does not represent the true agreement of the parties, this Court has traditionally followed what is known as the "strong proof" rule set out in *Ullman v. Commissioner*, 264 F.2d 305, 308 (2d Cir. 1959), affg. 29 T.C. 129 (1957):

"when the parties to a transaction * * * have specifically set out the covenants in the contract and have there given them an assigned value, *strong proof* must be adduced by them in order to overcome that declaration. * * * [Emphasis supplied.]"

agreement. Where an agreement is permeated with ambiguity,[9] as in the instant case, we think the *Danielson* rule is inapplicable. See *Morrison v. Commissioner*, 59 T.C. 248, 256 (1972); cf. *Shepard v. Commissioner*, 57 T.C. 600, 611 (1972), revd. in an unpublished opinion 481 F.2d 1399 (3d Cir 1973).[10]

Our conclusion is consistent with the way this Court has treated ambiguity in a contract in "strong proof" cases. Where "Neither party seeks to vary the terms of the contract [and] * * * both merely attempt to construe an obviously ambiguous term of the contract in a light most favorable to their respective causes," the strong proof doctrine is inappropriate. *Peterson Machine Tool, Inc. v. Commissioner*, 79 T.C. 72, 82 (1982); see *Estate of Kreider v. Commissioner*, T.C. Memo. 1984–68, 47 T.C.M. 1071, 1075.

After examining the facts and circumstances of this case, we find the requisite ambiguity within the "four corners" of the agreement. Although the individual terms of the original agreement and addendum, when examined separately, appear clear, we find the language irreconcilable and hence ambiguous when the original agreement and addendum are applied and interpreted together.

In the instant case we find ambiguity surrounding the purchase price of petitioner's stock. Originally, the purchase price was $8,500. However, the addendum recites a purchase price of $10,000 for the stock. It is uncertain from reading the agreement whether the purchase price is $8,500, $10,000, or $18,500.

In addition, we find ambiguity surrounding the payment of "commissions" to petitioner. While the original agreement lists Schmitt and Benton as the buyers paying $8,600 for petitioner's stock, the corporation *and* Schmitt and Benton are also obligated to pay petitioner "commissions due" of $14,750. These figures indicate that the total amount petitioner was to receive pursuant to the original agreement was $23,250 ($14,750 + $8,500).

---

[9]We have previously suggested, without deciding this issue, that ambiguity may be an exception to the *Danielson* rule. *Freeport Transport, Inc. v. Commissioner*, 63 T.C. 107, 115 (1974); see *Thermoclad Co. v. Commissioner*, T.C. Memo. 1974–289.

[10]Unlike the facts here, in *Shepard v. Commissioner*, 57 T.C. 600, 611 (1972), there was no ambiguity as to the total *amount* of consideration the taxpayer received pursuant to the agreements. We found, there, that ambiguity surrounded the *allocation* of the consideration.

Notwithstanding the original agreement, the addendum (to which the corporation is *not* a party) recites a $10,000 payment by Schmitt and Benton to petitioner for his stock. Specifically, the addendum states that petitioner "accept[s] Ten Thousand Dollars ($10,000.00) as full and final payment for all outstanding shares of stock of Progress Corporation." The addendum also states that petitioner agrees to give up all claims against Progress, Schmitt, and Benton.

The language of the addendum does not indicate that the $10,000 amount was to be paid in addition to the total amount owing to petitioner pursuant to the original agreement, or $23,250. In this light, it is reasonable to interpret the addendum as restructuring the amount of the purchase price for the stock and "commissions due" to petitioner.

If the $10,000 is construed as increasing the purchase price for the stock from $8,500 to $18,500, petitioner would be entitled to $4,750 ($23,250 – $18,500) in "commissions." The $4,750 amount does not coincide with the $14,750 amount recited in the original agreement as "commissions due" to petitioner.

In the alternative, if the $10,000 is construed as the full purchase price for the stock, petitioner would be entitled to $13,250 ($23,250 – $10,000) in "commissions." The $13,250 amount also does not coincide with the $14,750 amount recited in the original agreement as "commissions due" to petitioner.

However, if the corporation actually paid $14,750 as recited in the original agreement, this amount exceeds both the $13,250 and $4,750 amounts petitioner would alternatively be entitled to for "commissions due." If the corporation paid more than it was obligated to, it would appear that Progress was partially redeeming petitioner's shares. Under this scenario, the transaction would not be a straight purchase by Schmitt and Benton as indicated by the terms of the original agreement.[11] Thus further ambiguity surrounds who is the buyer of petitioner's stock in Progress.

Due to the irreconcilable differences and inherent ambiguities in applying and interpreting the language of the agreement, the *Danielson* rule does not apply. The ambiguity that

---

[11]The issue of whether Schmitt and Benton are actual purchasers of petitioner's stock or whether the corporation is redeeming petitioner's shares was not presented to us by the parties for decision.

permeates the language of the agreement renders an application of the *Danielson* rule inappropriate under these circumstances.

Petitioner has the burden of proving that he received $24,974 in exchange for his stock interest in Progress. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. We must construe the transaction in light of the uncontroverted facts. In so doing, we are not bound by the parties' labels, but only by the facts. See *Commissioner v. Court Holding Co.*, 324 U.S. 331 (1954); *Gregory v. Helvering*, 293 U.S. 465 (1935). Moreover, we are justified in looking to parol or extrinsic evidence.[12]

The purchase price of $8,500 recited in the original agreement is not credible in light of the evidence presented as to the fair market value of petitioner's stock interest. Rather, we think that the fair market value and the purchase price of petitioner's stock is approximately $25,000. Mr. Sarris, an insurance consultant with whom the four shareholders had funded their buy-sell agreement, testified that the corporation purchased four policies, one for each of the shareholders, equal to $25,000 each. Mr. Barratta, a lawyer who represented the corporation in its early stages and was familiar with all of the shareholders at the time of the execution of the agreement, testified that there was no question that the agreement was always meant to be a sale and purchase of petitioner's and Becker's interest in Progress.

In addition, the original shareholders' method of arriving at the $25,000 amount further supports this figure as the fair market value of petitioner's stock interest in Progress. There is testimony by both Schmitt and Benton that the four shareholders arrived at the $25,000 amount by starting with the initial $10,000 each shareholder had invested in Progress

---

[12]In cases such as this one, where we are "concerned [with] the proper allocation (or character) of amounts paid under a contract," the "third-party to the instrument rule" applies, and parol or extrinsic evidence offered by either party in connection with a written document will generally be admissible. *Estate of Craft v. Commissioner*, 68 T.C. 249, 263 (1977), affd. 608 F.2d 240 (5th Cir. 1979). However, in *Danielson*, the Third Circuit seemed to express its preference for the more restrictive approach to the admissibility of parol or extrinsic evidence which looks to and follows applicable State law. 378 F.2d at 779. However, the same result ensues from either approach. Namely, parol or extrinsic evidence is admissible in this case. Under the applicable State law, it is well settled that the parol evidence rule does not prevent the admission of testimony or evidence to establish the true consideration of a transaction. *Scientific Living, Inc. v. Hohensee*, 440 Pa. 280, 270 A.2d 216 (1970); *Pronzato v. Guerrina*, 400 Pa. 521, 163 A.2d 297 (1960); *Peyton v. Margiotti*, 398 Pa. 86, 156 A.2d 865 (1959); 3 A. Corbin, Contracts, sec. 586 at 489 (1960).

and then adding 25 percent of the "money in the drawer" (commissions from completed sales transactions), commissions from pending transactions, other assets of the corporation, and appreciation.

Respondent claims that petitioner had a right to commissions from completed sales and pending transactions. Accordingly, he contends that commissions should not be treated as corporate assets but as wages to petitioner.

The proposition that petitioner had a "right" to any commissions is without support in the record. Petitioner had no express contract of employment or commission payment with the corporation. In fact, none of the shareholders had a right to commissions without a board vote to the contrary; their distribution of remaining sales profits only became a right annually upon the oral agreement of the board on how to split the profits. Payments to the shareholders were treated by the shareholders as if Progress was a partnership or subchapter S corporation rather than a subchapter C corporation. It appears that the original four shareholders were merely using the corporate facade while channeling out earnings and profits by way of the "commission paid out" deduction, thereby avoiding the tax at the corporate level.[13] Moreover, since the distribution of remaining sales profits occurred at the corporation's yearend, "commissions due" were already distributed to petitioner at the close of 1977. At the time of the execution of the original agreement in March 1978, the only "commissions" that would be "due" petitioner would be for sales in January and February 1978. This amount certainly could not approach the $14,750 that Progress *and* Schmitt and Benton were jointly obligated to pay petitioner under the original agreement.

Based upon the entire record in this case, we think the $24,974 amount the parties agree that petitioner received was for the purchase and sale of his stock interest in Progress. The terms of the agreement thus reveal that the buyers intended to use the corporation's income as a means to finance a portion of the purchase price of petitioner's stock. Essentially, the agreement was used as a financing tool. In this manner, the transaction took the form of a part sale and part redemption

---

[13]The issue of whether past distributions to the original four shareholders were properly treated as commissions as opposed to dividends or salary is not before us for decision.

(see secs. 302(b)(3), 317(b)[14]), or else a total sale to Schmitt and Benton using Progress as their agent (see *Zenz v. Quinlivan,* 213 F.2d 914 (6th Cir. 1954)). In either event, petitioner is entitled to capital gains treatment for the $14,974 amount (the excess of his amount realized over his basis in the stock). Sec. 1001.[15]

Because of other concessions by respondent,

*Decision will be entered under Rule 155.*

---

[14]All section references are to the Internal Revenue Code of 1954 as amended.
[15]Because of our resolution of the first issue in petitioner's favor, we need not address the second issue regarding self-employment tax.
[1]All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.